J-S04013-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.K.V. II, A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.K.V. I, FATHER, | |
| | No. 414 WDA 2015 |

Appeal from the Order February 25, 2015
In the Court of Common Pleas of Lawrence County
Civil Division at No(s): 20037-2014 D.C.A.

| | |
|---|---|
| IN THE INTEREST OF: J.K.V. II, A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.K.V. I, FATHER, | |
| | No. 415 WDA 2015 |

Appeal from the Order Entered February 25, 2015
In the Court of Common Pleas of Lawrence County
Civil Division at No(s): CP-37-DP-0000030-2013
NO. 30 OF 2013 D.C.A.

| | |
|---|---|
| IN THE INTEREST OF: J.K.V. II, A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.K.V. I, FATHER | |
| | No. 416 WDA 2015 |

J-S04013-16

Appeal from the Order February 25, 2015
In the Court of Common Pleas of Lawrence County
Civil Division at No(s): CP-37-DP-0000035-2013

BEFORE:  BOWES, OLSON, and STRASSBURGER,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 04, 2016**

J.K.V. ("Father") appeals from the order entered on February 25, 2015, wherein the orphans' court terminated his parental rights to his son, J.K.V. II.[1]  We affirm.

At the outset, we observe that Father's appeals filed at Court of Common Pleas of Lawrence County action numbers 30-2013 and and 35-2013 stem from dependency proceedings that are not at issue in this case regarding the termination of parental rights.  The proceedings at action number 30-2013 related to a prior application for shelter care that the Lawrence County Children and Youth Services ("CYS") filed and subsequently withdrew on on April 12, 2013.  Hence, that case is closed and there is no order from that proceeding that is currently before us.  Accordingly, we quash the appeal filed at 415 WDA 2015 regarding action number 30-2013.

_____

*  Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court order also terminated the parental rights of D.B., J.K.V. II's birth mother.  We do not address that aspect of the order.

Similarly, the appeal filed at action number 35-2013 relates solely to the underlying juvenile court proceedings and apparently challenges the juvenile court's adjudication of dependency pursuant to 42 Pa.C.S § 6341(c).[2] Any appeal from the juvenile court's order adjudicating J.K.V. II dependent had to be filed within thirty days of the date the order was filed. *See* Pa.R.A.P. 903. Herein, the juvenile court adjudicated J.K.V. II dependent on November 20, 2013, and Father failed to appeal that order or any ensuing order from the juvenile court. Hence, that appeal is also

_____

[2] It is not entirely clear why Father purported to appeal from multiple action numbers when the only appealable order was entered at 20037-2014, relating to the termination of parental rights. We observe that CYS filed a motion in the dependency proceedings to change J.K.V. II's permanency goal to adoption and the juvenile court scheduled argument concurrent with the evidentiary hearing on the agency's petition for involuntary termination. CYS reasserted its motion at the outset of the involuntary termination hearing, but the trial court, sitting as the orphans' court in that proceeding, did not dispose of the dependency-related motion on the record or in the resulting order terminating parental rights. Moreover, the copy of the docket for the juvenile court proceedings that is included in the certified record confirms that the juvenile court never entered an order granting the motion for a goal change. Hence, nothing exists to form the basis of the instant appeal filed at 35-2013. In addition, in light of the facts that (1) Father does not purport to challenge the goal change and (2) it is beyond peradventure that the orphans' court may terminate parental rights regardless of whether the juvenile court has formally changed a dependent child's goal to adoption, we decline to address that juvenile court matter *sua sponte*. **See In re Adoption of S.E.G.**, 901 A.2d 1017, 1026 (Pa. 2006)("an agency may file a termination petition even where reunification remains the permanency goal for the child."); **In re M.T.**, 101 A.3d 1163, 1166 (Pa.Super. 2014) (*en banc*) (juvenile court's goal change is not prerequisite to involuntary termination of parental rights in orphans' court).

improper. Therefore, we quash the appeal at 416 WDA 2015 concerning action number 35-2013.

J.K.V. II was born during June 2013. CYS was familiar with the family because it had an open case involving an older half-sibling. When CYS discovered that Mother had given birth to J.K.V. II, it inquired as to who would care for the newborn. Mother advised the agency that she had placed J.K.V. II in Father's care. As CYS was not familiar with Father, it filed an application for shelter care pending its review. That application was withdrawn after CYS's investigation confirmed that Father had provided appropriate accommodations for his son at a relative's home in New Brighton, Pennsylvania.

CYS revived its concern approximately two weeks later after a caseworker observed Father wandering around downtown New Castle, Pennsylvania with J.K.V. II, the child's belongings, and a formula canister that was filled with flour instead of baby formula. The flour mixture was also discovered in the newborn's bottle. Father appeared to be homeless, which he denied, but he failed to provide the agency with a home address. CYS took emergency custody of J.K.V. II. On November 19, 2014, the juvenile court adjudicated J.K.V. II dependent, and placed him in kinship care with his paternal aunt and uncle, a pre-adoptive resource, where he has remained.

The original permanency goal was reunification. In order to achieve that goal, CYS crafted a child permanency plan ("the plan") that directed Father to, *inter alia*, secure and maintain housing, improve his parenting skills, address emotional instability, complete drug and alcohol counseling and treatment, participate in anger management, and refrain from criminal activity. Each of these components subsumed related goals and objectives that CYS used to measure Father's progress toward reunification.

Father's compliance with the plan was minimal. From the outset, Father was adversarial. He refused to even sign the plan, and he informed CYS that he would not participate in any of the programs absent a court order. He was so recalcitrant that he refused to execute a release to allow CYS to contact service providers in order to confirm the progress he made toward his goals and objectives. Father participated in thirteen of approximately thirty-eight bi-weekly supervised visitations with J.K.V. II, acknowledged his substance abuse by completing an inpatient treatment program, and passed the only drug screen that he volunteered to take. On the other hand, he failed to obtain housing, address his parenting deficiencies, confront his emotional instability, participate in anger management counseling, or refrain from criminal activity.

On September 17, 2015, CYS filed a petition to terminate Father's parental rights to J.K.V. II pursuant to the statutory grounds outlined in 23 Pa.C.S. § 2511(a)(5) and (8). Father was represented by the attorney who

had been appointed in the course of the dependency proceedings. During the ensuing hearing, CYS presented the testimony of Stephanie Kelley, the caseworker currently assigned to the family and the custodian of the agency's case file. Father testified on his own behalf. On February 25, 2015, the orphans' court terminated Father's parental rights pursuant to § 2511(a)(8) and (b). This timely appeal followed.[3]

Father raises one issue. "The trial court abused its discretion [in] terminating [F]ather's rights without full consideration that the child had been detained for [an] unsubstantiated allegation and that [F]ather had substantially complied with what was required of him to reunify him with the child."[4] Father's brief at xxi.

Our standard of review is well settled.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

_____

[3]Although represented at that juncture, Father filed a *pro se* notice of appeal. The orphans' court subsequently granted trial counsel's petition to withdraw and eventually appointed current counsel, who filed Father's appellate brief with this Court.

[4] We interpret Father's curious reference to J.K.V. II's "detention for [an] unsubstantiated allegation" as a challenge to the juvenile court's finding that J.K.V. II was a dependent child as the term is defined in 42 Pa.C.S § 6302. While the propriety of the adjudication of dependency is not properly before this Court, we understand the gist of Father's argument, *i.e.*, since the agency's concern over Father's homelessness was misplaced, the goals and objectives that CYS established for Father lacked any rational relationship to the facts of this case.

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, CYS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203–04 (Pa. 1989).

As noted, the orphans' court terminated Father's parental rights pursuant to § 2511(a)(8) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .

>(8) The child had been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
>. . . .
>
>**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8) and (b).

In order to satisfy the requirements of § 2511(a)(8) in the case at bar, CYS was required to produce clear and convincing evidence that: (1) J.K.V. II has been removed from Father for at least twelve months; (2) the conditions which led to the child's removal continue to exist; and (3) involuntary termination of parental rights would best serve J.K.V. II's needs and welfare. ***See In Re Adoption of M.E.P.***, 825 A.2d 1266, 1275-1276 (Pa.Super. 2003). "Notably, termination under Section 2511(a)(8), does **not** require an evaluation of [Father's] willingness or ability to remedy the conditions that led to placement of her children." ***In re Adoption of R.J.S.***, 901 A.2d 502, 511 (Pa.Super. 2006) (emphasis in original).

First, we observe that J.K.V. II has been in CYS's care since April of 2013, due to concerns that Father was homeless and lacked a minimal degree of parenting skills. As CYS did not file its petition to terminate Father's parental rights until September 17, 2014, approximately seventeen months later, CYS satisfied the threshold requirement of § 2511(a)(8), which mandates that the child be removed from Father for at least twelve months. Next, the certified record reveals that the condition that led to J.K.V. II's removal in April 2013, *i.e.*, Father's inability to provide his son a safe and secure environment continued to exist, and that terminating Father's parental rights would best serve J.K.V. II's needs and welfare.

During the evidentiary hearing, Ms. Kelley testified that she had been assigned to the family since May 2014. N.T., 12/11/14, at 5. She was the current custodian of the family's file. Ms. Kelley outlined Father's lack of cooperation and refusal to sign the plan or comply with it absent a court order. **Id**. at 14-15. She highlighted Father's goals, justified their inclusion into the plan, and gave a brief explanation of what was expected of him. For example, under the goal of maintaining secure housing, which addressed the agency's primary concern of homelessness, Father was required to lease an appropriate residence for six months in order to demonstrate stability. **Id**. at 25. He was not compliant with this component.

Ms. Kelley testified that Father failed to provide CYS with any address between the date of his son's placement during April 2013 and July of 2014,

when he provided an address to a home that was vacant. *Id*. at 25, 27. When the agency confronted him with the fact that he provided an address to an unoccupied home, Father claimed that he lived on the second floor of the home and that his belongings could not have been viewed from the outside. *Id*. at 25-26. He continued that it would not be necessary for CYS to return to the home for an inspection of the upper level because he intended to move to a better neighborhood and would forward the agency his new address. *Id*. at 26. Father failed to provide that information. *Id*. Three months later, Ms. Kelley serendipitously discovered that Father was living with Mother, after he used a house key to enter Mother's residence through a locked door and unknowingly interrupted a discussion that Mother was having with Ms. Kelley in the home. *Id*. at 27. Father denied that he lived with Mother, but Mother subsequently admitted that he resided in her home and a check of the public welfare records confirmed that Father listed that address as his residence. *Id*.

In order to improve his parenting skills, Father was expected to attend supervised visitation, cooperate with the agency, complete a parenting class, and demonstrate the appropriate parenting skills. Father did not attend a parenting program and he only participated in thirteen of thirty-eight bi-weekly supervised visitations scheduled since April 2014. *Id*. at 29-30, N.T., 2/12/15, at 47. At least once, Father called after the missed visitation in order to proffer an excuse. N.T., 12/11/14, at 30. On other occasions,

however, he simply failed to attend the visitations without notice or excuse. N.T., 2/12/15, at 34, 37. The tone of the visitations was neither positive nor negative. *Id*. at 47.

Ms. Kelley also testified about Father's failure to address his emotional instability and drug and alcohol treatment. She indicated that the agency included these components in the plan due to his criminal history and potential substance abuse. N.T., 12/11/14, at 32, 34. She explained that "the number of past convictions often relates to a [parent's] stability. Depending on [the nature of the charges and prior behaviors] . . . we've seen in the past[,] maybe we still see [them]." N.T., 2/12/15, at 51. The agency attempts to determine whether the criminal activity is connected to drug or alcohol abuse or whether a pattern exists that will forecast future issues. *Id*. at 51-52. Ms. Kelley surmised, "We would like to see stability before we release a child to [a parent], because . . . we don't want to traumatize the child by bringing them back into the system." *Id*. at 52.

As it relates to mental health, Father was required to have a psychological evaluation, comply with treatment recommendations, and execute releases in order to permit CYS to confirm his compliance. N.T., 12/11/14, at 32. In relation to the substance abuse component, Father had to participate in a drug and alcohol assessment, comply with treatment recommendations, submit random drug screens, and attend three Narcotics

Anonymous ("NA") or Alcoholics Anonymous (AA") meetings per month. *Id*. at 34. His compliance with these goals was half-hearted.

Father apparently scheduled a mental health assessment and attended that intake appointment. However, he failed to share the results of the assessment or confirm whether he completed the program or followed the treatment protocol. *Id*. at 33-35; N.T., 2/12/15, at 41-42. Indeed, without releases permitting CYS to substantiate Father's self-reporting, there was no documentation that he completed any of the necessary tasks. N.T., 12/11/14, at 33-34.

CYS encountered similar impediments in determining whether Father addressed his substance abuse. Ms. Kelley testified that Father was uncooperative with prior caseworkers' attempts to administer drug screens, but she indicated that Father passed the one drug screen that he permitted her to administer. N.T., 2/12/15, at 41. Similarly, he completed inpatient treatment administered by the Addiction Recovery Center ("ARC"), however, it remained unclear whether he engaged in the required clean-and-sober aftercare program at another facility. *Id*. at 40; N.T., 12/11/14, at 35-37. Again, without the appropriate releases, the agency could not confirm that Father initiated after-care. N.T., 12/11/14, at 36. Likewise, Father neglected to attend the required number of AA and NA meetings per week. *Id*.

Finally, as it relates to domestic violence and anger management, Ms. Kelley testified that those features of the plan were necessary to address reported concerns of domestic violence between Father and Mother. *Id*. 37. In addition, based upon the nature of Father's prior criminal activity, CYS believed that anger management would be beneficial. *Id*. at 38. Father neglected to address either component. *Id*. At the time of the February 2015 evidentiary hearing, Father was incarcerated for a probation violation, and he was subject to a temporary protection from abuse ("PFA") order that had been entered for Mother's protection. N.T., 2/12/15, at 53-54.

Ms. Kelley concluded that J.K.V. II was thriving in the pre-adoptive foster home with his paternal aunt and uncle and that she did not have any concerns about his health and welfare. *Id*. at 52-53. She opined that it was in J.K.V. II's best interest to terminate Father's parental rights. She concluded, "The child is comfortable with [paternal aunt and uncle.] They have expressed their willingness and eagerness to keep him if the termination does go through. He interacts with [them] as though they're [his] parents." N.T., 12/11/14, at 42.

The foregoing evidence sustains the trial court's determination that CYS proved by clear and convincing evidence the statutory grounds to terminate Father's parental rights to J.K.V. II pursuant to § 2511(a)(8). J.K.V. II has been removed from Father's care for approximately two years as of the date of the termination hearings; the conditions that led to the

child's removal continue to exist; and, as discussed *infra*, involuntary termination of parental rights would best serve J.K.V. II's needs and welfare. Stated plainly, Father's failure to address his mental health issues, rectify his parenting deficiencies, and secure stable housing, illustrates that he is unable to care for his son. Accordingly, we find that the record supports the orphans' court's conclusion that CYS satisfied the statutory requirements to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8). ***See In re Adoption of R.J.S.***, ***supra***.

We reject Father's assertion that CYS should not have interfered with the family in the first place because the agency's claim of his homelessness was unfounded. Equally unpersuasive is Father's protestation that the services that CYS required him to complete were unconnected to the reason for its involvement. First, to the extent Father intended to challenge the juvenile court's decision to adjudicate J.K.V. II dependent, Father failed to appeal that decision, which is entirely independent of the orphans' court's current decision to terminate parental rights. Hence, Father's stale complaint regarding the sufficiency of the evidence that CYS adduced before the juvenile court during 2013 to demonstrate his homelessness is not properly before this Court. What is highly relevant, however, is the fact that two years after the initial determination of homelessness, Father remains unable to secure safe and stable housing as required by the plan, and he attempted to mislead the agency about living with Mother. As it relates to

Father' secondary complaint, we underscore that Ms. Kelley explained during the evidentiary hearings the various reasons that the agency selected the precise objectives for Father in the child permanency plan. Stated simply, CYS perceived risks related to, *inter alia*, Father's homelessness, parenting deficiencies, emotional instability, substance abuse, and criminal activity, and it crafted goals that would permit Father to remedy those inadequacies. In obdurate defiance of CYS, Father intentionally squandered the agency's efforts by either failing to comply with the plan or neglecting to execute a release of information that would permit CYS to confirm his accomplishments. No relief is due.

Next, we address whether the trial court abused its discretion in finding that CYS presented sufficient evidence to demonstrate by clear and convincing evidence that terminating Father's parental rights and permanently severing the existing bond between him and J.K.V. II would best serve the child's needs and welfare pursuant to § 2511(b). While the Adoption Act does not mandate that the trial court consider the effect of permanently severing parental bonds, our case law requires it where a bond exists to some extent. ***See In re E.M.***, 620 A.2d 481, 485 (Pa. 1993).

The extent of the trial court's bond-effect analysis depends upon the circumstances of a particular case. ***In re K.Z.S.***, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that, while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis,

- 15 -

it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in *In re K.Z.S.*, *supra* at 763 (emphasis omitted),

> In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*See also In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010) (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability child might have with the foster parent, and importance of continuity of existing relationships).

Herein, the orphans' court concluded that severing the parental bond and freeing J.K.V. II for adoption was in the child's best interest. The court implied that the parental bond that nurtures safety, security, and permanency exists between J.K.V. II. and his foster parents rather than

between him and Father. The court reasoned,

> Although . . . Father did care for J.V. in the months immediately following his birth, the evidence is void of any facts to support a finding that [he] developed a strong and proverbial bond with J.V. or that J.V. has any bond with either parent. Furthermore, . . . Father offered [no] evidence that [he is] prepared to care for J.V. in the immediate future if the underlying petition was denied. Accordingly, the Court determines that termination of parental rights would best serve the minor child's best interests.

Trial Court Opinion, 2/25/15, at 12.

Our review of the certified record confirms the orphans' court's conclusion. Ms. Kelley stated that the tone of Father's visitations with J.K.V. II was neither positive nor negative. N.T., 2/12/15, at 47. There was little bonding during those sessions. N.T., 12/11/14, 29. She indicated, "[T]he child would be more preoccupied with playing with the toys than engaging with Father." *Id*. Similarly, he did not cry or act out when he was separated from Father following the visitations. *Id*. at 39. Indeed, Ms. Kelley opined, "the child reacts . . . to . . . [F]ather [in] the same way [he] reacts to [her, as his caseworker]." *Id*.

In contrast to the disinterest that he demonstrated toward Father, J.K.V. II sought out his paternal aunt for comfort on the few occasions that he needed consolation during the visitations. *Id*. at 38. Furthermore, Ms. Kelley made the following observations regarding the child's interactions with paternal aunt and uncle at the pre-adoptive foster home. *Id*. at 40. There is a discernible bond between J.K.V. II and his paternal aunt, whom

he refers to as "Mimi." *Id*. at 41. He is comfortable in the foster home and displays affection for both foster parents. *Id*. 40-41. She described how J.K.V. II "climbs all over them. [H]e's really clingy to [his uncle] and still really possessive with [his aunt]." *Id*. at 41. In addition, he enjoys the love of his paternal family members who live nearby. *Id*. at 42. He is particularly close with his grandmother, and two cousins with whom he spends a lot of his time. *Id*. In sum, Ms. Kelley opined that J.K.V. II shares a bond with his pre-adoptive parents, and, if he has any connection with Father, it is weak. *Id*. at 42. As noted, *supra*, she believes that it was in J.K.V. II's best interest to terminate Father's parental rights so that the child can be adopted by his kinship foster parents.

As highlighted by the foregoing evidence, the certified record supports the trial court's needs and welfare analysis pursuant to § 2511(b). No meaningful bond exists between J.K.V. II and Father that would be detrimental to sever. The evidence confirms that J.K.V. II's primary attachment is to his pre-adoptive foster parents. That relationship reveals the hallmarks of a healthy parent-child relationship. In contrast, Father has not cultivated any bond with his son beyond visitation. The fact that J.K.V. II's primary attachment is with his pre-adoptive foster parents rather than Father is a significant factor in evaluating his developmental and emotional needs and welfare. *See In re K.Z.S., supra* ("the bond between [the child]

and [foster mother] is the primary bond to protect, given [the child's] young age and his very limited contact with Mother").

Thus, mindful of the additional factors that should be emphasized during the needs-and-welfare analysis in *In re K.Z.S.*, *supra* at 763, such as "the love, comfort, security and stability the child might have with the foster parent" and the importance of continuing that beneficial relationship, we find that the record confirms that terminating Father's parental rights best satisfies J.K.V. II's developmental, physical, and emotional needs and welfare.

For all of the foregoing reasons, we affirm the orphans' court order terminating Father's parental rights to J.K.V. II pursuant to § 2511(a)(8) and (b).

Order affirmed. Appeals filed at 415 WDA 2015 and 416 WDA 2015 quashed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/4/2016